Interocean Mercantile Corporation, Appellant, v. Sawyer Biscuit Company, Appellee.

Gen. No. 33,048.

552

Opinion filed June 26, 1929. Rehearing denied July 8, 1929.

CUTTING, MOORE & SIDLEY and AMOS C. MILLER, for appellant; AMOS C. MILLER, EDWIN C. AUSTIN and JOHN PAULDING BROWN, of counsel.

COOKE, SULLIVAN & RICKS, for appellee; EDWIN HEDRICK and EDWARD H. FIEDLER, of counsel.

MR. JUSTICE RYNER delivered the opinion of the court.

On May 21, 1920, a written contract was entered into between the parties to this litigation by the terms of which the plaintiff agreed to sell and the defendant agreed to buy 100 tons of sugar. The provisions of the contract pertinent to the issues raised on this appeal are as follows:

"Minford Lueder & Co.

106 Wall St.

New York          ·      May 21, 1920.

Sold To: Sawyer Biscuit Co.,

         Chicago, Ill.

         Through Meinrath Brokerage Co.,

         Chicago, Ill.

By Interocean Mercantile Corporation

About one hundred (100) long tons, (10% more or less) of Java white granulated sugar, at 23¾c per pound, net, duty paid, ex dock New York, landed weights less actual tare.

This sugar is sold on the basis of No. 25 Dutch Standard polarizing not less than 99 degrees, but in the event of it testing less, a corresponding allowance shall be made in accordance with New York rulings.

This sugar shall be shipped by steamer and/or steamers from Java between July 1st and August 31st, inclusive, and the relative bill of lading shall constitute proof thereof.

This sugar shall be taken delivery of by the buyer immediately on being unloaded."

On October 18, 1920, the plaintiff wrote the defendant:

"Messrs. Sawyer Biscuit Company,

Chicago, Illinois.

Dear Sirs:

With reference to your contract with us for 100 tons of sugar, we beg to inform you that all our August Java shipments were made on two steamers. The

first boat is due to arrive early in November, say about Nov. 10th, whereas the second steamer we have been advised has been delayed en route and will probably arrive some three weeks later. Will you kindly let us know whether you would prefer to receive the whole or part of your purchase out of the first steamer, or whether it would suit you best to get delivery out of the later boat, so that we can make all our arrangements accordingly, if possible. If for any reason you should prefer an immediate delivery we suggest that you take up with us the matter of giving you like sugars from spot stocks.

Kindly reply promptly, and oblige,

Yours faithfully,

· Interocean Mercantile Corporation

Gen. Manager.''

The steamers referred to in the letter were the Alloway and the Honolulu Maru.

Receiving no reply to its letter, the plaintiff on October 25, 1920, sent a telegram to the defendant stating:

''Please reply immediately to our letter of eighteenth October as we are now making allocations.''

There was no response by the defendant to either the letter or the telegram until November 22, 1920, when it telegraphed the plaintiff as follows:

''Replying your telegram received eighteenth instant we are under no obligation to accept sugar shipped on Alloway and you may take this as our refusal to do so.''

The next communication between the parties was a telegram, dated December 10, 1920, from the plaintiff to the defendant stating:

''Referring our letter Eighteenth October and your telegram Twenty-second November your hundred tons sugar will be delivered from Steamer Honolulu Maru due here next Wednesday December Fifteenth. Please arrange for payment Equitable Trust Company accordingly.''

Two days later the defendant replied by telegraph saying:

"Replying your telegram tenth instant we are under no obligation to accept sugar shipped on Honolulu Maru and you may take this as our refusal to do so."

On December 16, 1920, the Equitable Trust Company, to whom payment for the sugar was to be made, wrote to the defendant asking for the latter's reasons for refusing to accept the sugar from either steamer. The reply received, six days later, was:

"We refer you to our counsel in this matter, Messrs. Putnam, Bell, Dutch & Santry of Boston."

The steamer Alloway arrived in New York on November 12, 1920. The Honolulu Maru arrived December 15 of the same year. The defendant refused to accept the sugar or pay for it. It gave no reason for its refusal. On October 6, 1922, the plaintiff instituted suit in the circuit court of Cook county to recover damages for breach of the contract. A jury trial was had resulting in a verdict, and judgment upon the verdict, in favor of the defendant. The plaintiff appealed.

The pleadings are voluminous but they present but two simple issues. The principal defense was that the sugar tendered was not of the kind or quality called for by the contract. The other was that there was a default as to the time of shipment.

In connection with the conduct of the defendant the history of the sugar market in the United States for the year 1920 is decidedly enlightening.

It is conceded that in the early months of the year there was an acute shortage of sugar. A witness for the defendant, on cross-examination, said:

"There was a war shortage and the price went up to—wherever you could find any sugar, would bring most any old price, as far as that is concerned."

He might well have added that parties requiring sugar were willing to pay almost any price for any "old" kind of sugar. The condition of the market and

the causes of the condition were stated, by a witness for the plaintiff, to be as follows:

"Well, after the signing of the armistice, in the latter part of 1918, the restrictions on sugar throughout the world began to ease up, and the people whose sweet tooth had been denied them for three to four years previous began using sugar in large quantities, and prices gradually advanced during 1919, until the beginning of 1920, when the United States Equalization Board, which had charge of all the distribution of sugar in this country, ceased to function, and after that period there was an open market and prices advanced for granulated from about 9 cents a pound to as high as 28 to 30 cents a pound between the 1st of January and the middle of July, 1920, due to a tremendous buying move of manufacturers and consumers and grocers and distributors of sugar. Due to these high prices Europe started to sell sugar here. When I say Europe I mean all parts of the Old World, and as a consequence of this, by the middle of July we had sugars pouring in here from all sections of the world—Java, Mauritius, Belgium, France, Czecho-Slovakia, Hong Kong, Natal, India—and we had too, much sugar. We could not consume it, and we could not take care of it. The result was that beginning about the middle of July, the market broke and granulated receded down to under 5 cents a pound by the 1st of November of the same year."

The facts with reference to market conditions in the year in question were presented before the United States District Court for the Northern District of California in the case of *Mathieu v. George A. Moore & Co.*, 4 Fed. (2d) 251. The case involved a contract for the sale of 200 tons of Indo-Chinese sugar. The buyer refused to make payment and defended a suit brought by the seller upon the grounds that the sugar was not of the quality contracted for and that it was shipped in single instead of double bags. Neither defense prevailed. The court said:

"The record, and the correspondence are full of expressions by defendant showing that it had really contracted for a quality of sugar of which it had no knowledge whatsoever. The record, also, is full of evidence to the effect that the year 1920 was a time of frenzied speculation in sugar (as well as other commodities), and that there was a mad scramble for sugar everywhere."

And also made the further comment that:

"It (the sugar) arrived upon a glutted and falling market, and it was contracted for at a time when American buyers were feverishly contending with one another for any kind of sugar."

The conclusion of the court was that:

"The evidence fairly justified the conclusion that the defendant contracted for an article not readily salable in this market, and the rejection was due to the discovery of this fact, coupled with a falling market."

Among the numerous pleas filed by the defendant were several charging the plaintiff with fraud and misrepresentation as to the quality of the sugar contracted for and that it was known to the plaintiff that the sugar was unfitted for the uses of the defendant. No evidence, however, was presented to support any of these charges. Not a single representative of the defendant company testified. It relied solely upon the testimony of experts, who testified that the word "granulated," when used in connection with the description of sugar in the United States, and particularly in the vicinity of Chicago and New York, had acquired a fixed and definite meaning among dealers in sugar. According to their testimony the word signifies a sugar that has been refined by a method known as the bone char process or filtering through burned or charred animal bones for the purpose of removing impurities.

It is conceded that at the time in question, and prior thereto, no sugar made in Java was purified by this

process. It is likewise undisputed that, with two exceptions, the bone char process was universally used in the manufacture of sugar in the United States. The two exceptions were beet and plantation sugars. These were purified by the same processes used in Java. These were known as the carbonation and sulphitation processes. It is deemed unnecessary to describe these processes in detail or to discuss their relative merits. It suffices to say that the experts for the respective parties disagreed on the question as to whether a high grade granulated sugar could be manufactured without using bone char.

It is undisputed that the sugar in question graded better than No. 25 Dutch Standard, a standard of whiteness. It also polarized in excess of 99 degrees. It averaged about 99-8/10. The degree of polarization indicates the sucrose content. It came from Java. But the experts for the defendant say that the words ''Java'' and ''This sugar is sold on the basis of No. 25 Dutch Standard polarizing 99 degrees, but in the event of it testing less, a corresponding allowance shall be made in accordance with New York rulings,'' are without purpose or effect because of the use of the word ''granulated.'' They say this despite the fact that there was a dearth of sugar when the contract was entered into. They insist that the defendant was entitled to sugar of the same quality as American Standard granulated, refined by the bone char process, notwithstanding their testimony that this kind of sugar never polarizes less than 99-5/10 and is whiter than No. 25 Dutch Standard. If the defendant expected to receive sugar equal in quality to American Standard granulated, why did it sign a contract containing specific provisions for minimum requirements as to quality below that of American Standard granulated, and that, in the event the sugar did not meet these requirements, allowances as to price should be made?

The experts, testifying for the plaintiff, testified that the sugar shipped on the steamers Alloway and Honolulu Maru was granulated. They said it was put through a machine known as a granulator and that this process converted the wet mass of sugar into grains or granules which made it granulated sugar. They distinguished this process from that of molding the sugar into the form of cubes or dominoes.

The experts for the defendant contended that the word "granulator" was a misnomer and that the machine was nothing but a dryer and should be so designated. But whatever the name, the result is the same. Sugar in a wet cohesive mass has the moisture removed and comes out of the granulator or dryer in the form of grains or granules. It becomes granulated regardless of the particular process used to remove the impurities. Some of the witnesses, however, testified that in the process of manufacture the sugar forms into grains or crystals before it is put into the granulator. In other words, it is granulated before it is put through the granulator. But whether it is granulated before or after going through the granulator the undisputed facts in the record show that the sugar in question was "granulated" sugar.

One of the defendant's experts admitted, on cross-examination, that Webster's International Dictionary defines "granulated" as meaning "Consisting of or resembling grains"; "granulated in grains; granular; as granulated sugar." Finally, he said, "I wouldn't disagree with Webster on anything." Another one when asked about the definition of "granulated" given by the Century Dictionary, to like effect, said he did not conduct his business according to any dictionary. These answers are typical of those given by other of the defendant's experts.

It developed upon the trial that beet and plantation sugars manufactured and sold in the United States

are designated in contracts and containers as "granulated" sugars. Some of the witnesses for the defendant said that this was a false description but that the trade was not deceived because buyers could tell from the name of the plantation or place of origin that the sugar had not been subjected to the bone char process. Others said that it was improper to use the word "granulated" as applied to these sugars without adding the words "beet" or "plantation."

In the instant case there is no evidence that the defendant was deceived. It knew that the sugar contracted for was made in Java and not in America. It therefore knew that it was not to receive Standard American granulated sugar. There was not an iota of evidence showing or tending to show that the plaintiff made a single representation, false or otherwise, as to the quality of the sugar or the processes used in its manufacture. There was no competent evidence of any usage or custom with reference to the meaning to be given the word "granulated" when used as part of the description of Java sugars when sold in this country. In fact there could not have been any custom or usage because no Java sugars were imported into the United States until about the time the contract in question was entered into.

We are of the opinion that the undisputed facts in the record show that the sugar tendered fully complied with all of the conditions and requirements of the contract and that the trial court erred in not so advising the jury.

Another defense sought to be established by the defendant was that the sugar was not shipped within the time specified in the contract. It was conceded that the clause in the contract that "the relative bill of lading shall constitute proof" of the date of shipment is binding upon the parties, in the absence of fraud. An attempt was, therefore, made to show fraud and that, although the bills of lading showed the date of ship-

ment as the latter part of August, the loading of the steamers was actually begun on September 2. Evidence was also received for the purpose of showing that the bills of lading were executed at a port other than that from which shipment was made.

There was some evidence of the irregularities complained of, but we do not regard them as being of such a nature as to constitute fraud. Even if the acts complained of constituted fraud, the plaintiff was in nowise a party to it. The plaintiff bought the sugar through a brokerage concern. The seller and shipper of the sugar was a company in Java. Neither the plaintiff nor the defendant had any representative in that country. If there was any falsification of the shipping papers the plaintiff was no more responsible for it than the defendant. The plaintiff should not be chargeable with fraud which it did not commit. Almost the identical situation was presented in the case of *Erie Food Products Co. v. Interocean Mercantile Corp.* (evidently the plaintiff in the case at bar), 5 Fed. (2d) 1015, where the court said:

"We find that the plaintiff bought from brokers in Java a large quantity of sugar, to be shipped in July and/or August. In their purchase contract it was provided that the bill of lading should be proof of the shipment date. When plaintiff sold part of this same sugar to defendant, limited to the same shipment date, and since plaintiff would have no control over or knowledge of the facts as to shipment, it protected itself by a similar provision that the relative bills of lading should be proof of the date of shipment. If there was any falsity in these bills, plaintiff did not know it, and had nothing to do with it; and in these circumstances and in the absence of any fraud by plaintiff, the agreed proof must be taken as conclusive."

In the case of *Second Nat. Bank of Hoboken v. Columbia Trust Co.*. 288 Fed. 17, the court said:

"In a shipment of sugar from Java it would be difficult and troublesome to prove the date of shipment, in. case of dispute, and the inclusion of this provision in the contract was doubtless done to prevent just such a contingency as has arisen by making the date of shipment in the bill of lading 'proof' conclusive, and in the absence of fraud, which was disavowed by the defendant, the date in the bill of lading must be construed as absolute proof of the actual date of shipment."

. In the case of *Colonial Ice Cream Co. v. Interocean Mercantile Corp.*, 296 Fed. 316, the United States Circuit Court of Appeals, Third Circuit, affirmed a judgment of the District Court of the United States for the Eastern District of Pennsylvania in favor of the plaintiff in the present case. The judgment was for $89,374.98, and was based upon a directed verdict. The contract sued upon bore the same date as the contract. here involved and was for the sale of. 200 tons of Java white sugar at the same price, i. e., 23¾ cents per pound. The contract is not set out in the opinion and no details are given with reference to the description of the sugar or what tests the contract provided for determining its quality. No question about its quality was raised by the defendant.

The sugar was shipped on the steamer Honolulu Maru which arrived in New York on December 15, 1920. This was one of the shipments out of which the plaintiff in the present case, on October 18, 1920, advised the defendant it could have delivery upon arrival, if it so desired. When the sugar arrived the price had fallen from 23¾ cents to 6¼ cents per pound. The defendant refused to accept the sugar or to pay for it.

One of the defenses interposed was that the delivery order was insufficient. The court held the defense unavailing because there had been an anticipatory repudiation of the contract by the defendant, saying:

"There is no denial that the sugar, the required

quantity and quality, remained on the dock from December 16, to December 22, 1921. Defendant full well knew that the sugar was there and would be delivered on the payment of the purchase price, which it has tried to avoid by raising technical and unsubstantial objections. In fact, it is admitted that, prior to the arrival of the sugar, plaintiff notified defendant that it was about to arrive so that arrangements could be made to pay for it. Defendant replied 'that it would not accept the sugar and would not pay for the same.' This anticipatory breach rendered the presentation of the delivery order unnecessary, and the defendant may not now hide behind the alleged insufficiency of the order. *Hartley v. James,* 50 N. Y. 38; *Second National Bank of Hoboken v. Columbia Trust Co.* (C. C. A.) 288 Fed. 17, 22; *Zuck v. McClure,* 98 Pa. 541; *Central Trust Co. v. Chicago Auditorium Association,* 240 U. S. 581, 588, 36 Sup. Ct. 412, 60 L. Ed. 811, L. R. A. 1917B, 580.''

Objection was made to admission in evidence of the bills of lading and overruled. The court also refused to submit to the jury the question of their truth or falsity. The facts were presented by the deposition of John Engchiaw. He was an agent for the steamship company. He testified by deposition, in the present case, to substantially the same facts. The court in commenting upon the facts and the application of the law to them said:

''This contention is based upon the deposition of John Engchiaw, under whose supervision the bills of lading were prepared at Samarang, which was 175 miles from Sourabaya, the port at which the sugar was loaded on board the steamer. He was the general manager of the Osaka Shosen Kaisha, Limited, at Samarang, Java, hereinafter called the Osaka Company. N. V. Kwik Hoo Tong Handel Mij, hereinafter called the Kwik Company, was the agent and representative of the Osaka Company at Sourabaya. The

Kwik Company telephoned Engchiaw that the Honolulu Maru was due to arrive at Sourabaya on August 28, 1920, and he began to make out the bills of lading that day. Four thousand tons of sugar were placed under the control of the Osaka Company at Sourabaya—1,000 tons on August 27, and 3,000 tons on August 28, 1920. It was in the 'go-downs' of the shippers at that place.

"(1) Engchiaw testified that he being at Samarang, 175 miles from Sourabaya, did not know, of his own knowledge, the date of the shipment of the sugar."

The court held that, in the absence of fraud, the provision in the contract that the relative bill of lading should constitute proof of the date of shipment was a binding and enforceable agreement, saying:

"For their mutual protection the parties provided in the contract that the relative bill of lading should constitute proof of the date of shipment. The defendant contends that 'shipment' means 'putting the goods on board of a vessel,' while the plaintiff contends that it means 'delivery of goods to a carrier for transportation, whether by land or water or both.' Whichever it means, the contract provided that the relative bill of lading should constitute proof of that fact, and in the absence of fraud, which is neither alleged nor proved, this provision meant proof conclusive. *Second National Bank of Hoboken v. Columbia Trust Co. et al.* (C. C. A.) 288 Fed. 17. The dates of shipment contained in the bills of lading are within the time specified in the contract. Admittedly this is the real question in the case, and we resolve it against the defendant."

The evidence in the present case is that the plaintiff had no knowledge of the acts of the agent of the steamship company or any control over them. The plaintiff was as innocent of any fraud as the defendant. There was no inducement for it to delay the shipment or to cause the bills of lading to be falsified, if they were falsified.

At the instance of the plaintiff the trial court instructed the jury that the bills of lading were conclusive upon the parties as to the shipment date, in the absence of fraud, and that the defendant had the burden of proving fraud. But, at the request of the defendant, the court instructed the jury as follows:

"You are instructed that under the law and the evidence in this case plaintiff was obliged to ship or cause to be shipped as defined in these instructions from Java not later than August 31, 1920, the sugar contracted for. If you believe from the evidence that the sugar in question was not shipped from Java until after August 31, 1920, then the plaintiff cannot recover."

This instruction was peremptory in form and clearly erroneous. It omitted the element of fraud. It told the jury that, regardless of any question of fraud, they should bring in a verdict in favor of the defendant if they found as a fact that the sugar was not shipped from Java until after August 31, 1920. It also failed to advise the jury what constitutes shipment, a question of controversy among the authorities. The giving of this instruction was incurable error. *Daubach v. Drake Hotel Co.*, 243 Ill. App. 298. The court in that case said:

"According to the well-settled rule, since the instruction is a peremptory one, the error in the instruction cannot be cured by any other instruction in the series of instructions. *Cantwell v. Harding,* 249 Ill. 354, 358; *Cromer v. Borders Coal Co.,* 246 Ill. 451, 457; *Illinois Iron & Metal Co. v. Weber, supra* [196 Ill.] (p. 531)."

The court, at the request of the defendant, further instructed the jury, that:

"If you believe from the evidence that the words 'Java White Granulated Sugar' as used in the contract meant a cane sugar that had its acidity content removed as best possible through the bone char process and if you further believe from the evidence that

the bone char process is the only process by which the acidity content of such sugar was best removed, and if you further believe from the evidence that the sugar offered or tendered by the plaintiff to the defendant did not have the acidity content removed as hereinbefore stated through the bone char process, then the defendant was not obligated to accept the sugar offered or tendered."

This instruction is also erroneous. There was no evidence that there was any acid in the sugar tendered. The instruction submitted to the jury a feigned issue as to whether the bone char method was the best for removing acidity content, if any, from sugar. It concluded with an assumption that the sugar in question contained acid and then advised the jury that if the acid content had not been removed through the bone char process the defendant was not obligated to accept the sugar. Further, there was no issue about the process used in manufacturing the sugar in question. The plaintiff made no contention that the bone char process was used.

It is not deemed necessary to consider other given and refused instruction discussed in the briefs. The giving of either one of the instructions above set out constituted reversible error and of such a nature as to require a reversal of the judgment of the trial court.

Some point is made by the defendant that there was no valid tender of the sugar. But, a formal tender would have been a mere idle ceremony. After the plaintiff wrote its letter of October 18, 1920, offering to make delivery from either of the two steamers or immediate delivery from spot stocks, the defendant remained silent for more than a month. In the meantime it had received a telegram urging immediate reply to the letter. It prevailed upon the court to exclude evidence as to the market prices of sugar during this period. Evidently it never intended to accept the sugar or was speculating on changes in the price at

the risk of the plaintiff. Then later came the advise that it was not obligated to accept sugar shipped on either of the steamers and finally to see its lawyers, at a time when the price of sugar had dropped to 6¼ cents per pound. It never replied to the offer of the plaintiff to make immediate delivery from spot stocks, although the plaintiff testified, and without contradiction, that, when the offer was made, he had available more than a sufficient amount of sugar to make full delivery.

The acts of the defendant established all of the elements necessary to constitute an anticipatory repudiation of its contract and thus to excuse the plaintiff from performing the useless act of making a formal tender of delivery. *Colonial Ice Cream Co. v. Interocean Mercantile Corp.*, 296 Fed. 316; *Norton Iron Works v. Wilson Steel Products Co.*, 232 Ill. App. 523. The law on this point is well stated in the latter case where the court in its opinion stated the law as follows:

"It is further claimed by defendant's counsel that after plaintiff acquiesced in defendant's request to withhold shipments until further notice, (although no such further notice was ever given by defendant) plaintiff could not recover without proving a tender of performance on its part; and it is said that no such tender was shown. In making this contention, counsel cite and rely on section 51 of the Uniform Sales Act (Cahill's Ill. St., ch. 121a, ¶ 54), which provides that 'When the seller is ready and willing to deliver the goods, *and requests the buyer to take delivery*, and the buyer does not within a reasonable time *after such request* take delivery of the goods, he is liable to the seller for any loss occasioned by his neglect or refusal to take delivery.' If it be conceded that a tender of any kind was necessary under the facts of this case (which we do not decide), we think such a tender as this section of the statute requires was shown. The

letter of October 7, 1920, in which the plaintiff requested permission of the defendant to 'resume shipments' was, in effect, a request on the buyer 'to take delivery'; and the plaintiff was then 'ready and willing to deliver the goods.' This is all the statute requires. Even before the Uniform Sales Act was passed, the law did not require a seller to carry around with him such a bulky commodity as 630 tons of steel rods in order to physically tender the same to a purchaser. If the seller had the goods ready to be delivered and offered to deliver them, that was a sufficient tender. (*Sanborn v. Benedict*, 78 Ill. 309, 313.)''

The facts with reference to a tender or excuse for not tendering delivery of the sugar, being undisputed, presented a question of law for the court and it was error to submit the issue to the jury.

As we view the law in the light of the undisputed facts in the record the court should have granted the motion of the plaintiff to instruct the jury to retain a verdict in its favor.

The plaintiff asks that judgment be entered in this court in its favor for the amount claimed in its affidavit of claim. This we are without authority to do in a case where the right to a trial by jury exists. *City of Spring Valley v. Spring Valley Coal Co.*, 173 Ill. 497; *North Side Sash and Door Co. v. Goldstein*, 286 Ill. 209; *Knight v. Seney*, 290 Ill. 11. This court is likewise without power to direct the entry by the trial court of a proper judgment. But, it may direct the trial court to proceed in conformity with the legal principles announced in its opinion. *People v. Lord*, 315 Ill. 603.

For the foregoing reasons, the judgment of the circuit court of Cook county is reversed and the cause remanded with directions to proceed with a new trial in conformity with the views expressed in this opinion.

*Reversed and cause remanded with directions.*

WILSON, P. J., and HOLDOM, J., concur.