GREAT WESTERN SUGAR COMPANY, Plaintiff-Appellee, v. WORLD'S FINEST CHOCOLATE, INC., Defendant-Appellant.

First District (5th Division)   No. 85—0605

Opinion filed May 6, 1988.—Rehearing denied June 14, 1988.

Narcisse A. Brown and John L. Hines, Jr., both of Schwartz, Cooper, Kolb & Gaynor, Chartered, of Chicago, for appellant.

Benjamin D. Schwartz, of Altheimer & Gray, of Chicago, and Victor F. Boog, of Bradley, Campbell & Carney, P.C., of Golden, Colorado, for appellee.

JUSTICE PINCHAM delivered the opinion of the court:

Plaintiff, The Great Western Sugar Company (Great Western), instituted this action against the defendant, World's Finest Chocolate, Inc. (World's Finest), for an alleged breach of a contract for the sale of sugar. After a trial by the court judgment in the amount of $60,445.48 and costs was entered against World's Finest in favor of Great Western. World's Finest appeals. We affirm.

The facts established at trial follow. Great Western was in the business of manufacturing and selling sugar. Jim Carroll was Great Western's regional sales manager in the Chicago area. World's Finest was in the business of manufacturing chocolate for sale to charitable and fund-raising organizations. Jim Herrick was responsible for World's Finest's purchases of sugar and other materials. Herrick arranged for the purchase of sugar by World's Finest from Great Western through Carroll.

On October 20, 1980, in a telephone conversation with Carroll, Herrick ordered 6,000 hundredweights of sugar from Great Western. Herrick and Carroll agreed that the sugar would be delivered to World's Finest during the first quarter of 1981. Following the October 20, 1980, telephone conversation between Herrick and Carroll, C. H. Criswell, Great Western's vice-president in sales, sent to Herrick a confirmation letter dated October 24, 1980, confirming the terms of the October 20 telephone agreement between Carroll and Herrick.

Criswell's letter stated in pertinent part:

"Dear Mr. Herrick:

We are pleased to confirm our refined sugar sale to you, under the following conditions:

Quantity: 6,000 CWT

Product: Truckloads Bulk Sugar EFG

Delivery Period
and Price: Jan—Mar '81—6000 CWT @ $47.90 plus Actual Freight

Payment Terms: 2% 10 Net Days from date of invoice

Other Conditions: Delivered price of $49.76 was authorized by Mr. C. H. Criswell to meet competition from Indiana Sugars.

This letter is a written confirmation of our agreement, and unless it is signed by the Buyer and returned to Great Western within 15 days from the date hereof, the agreement shall be deemed breached by Buyer and automatically terminated. Please sign and return to me the enclosed counterpart of this letter signalling your acceptance of the above agreement.

\* \* \*

By: C. H. Criswell
Title: Vice President-Sales
Great Western Sugar
Company"

The enclosed counterpart of the above letter was returned by Herrick to Criswell with the following signature:

"Accepted:

Company Name: World's Finest
By: J. R. Herrick
Title: Purchasing Agent"

At this point, the plaintiff's and the defendant's versions of subsequent events differ.

Carroll testified that in 1969, when he entered the sugar industry's marketplace in the Chicago area, many large sugar buyers were afforded downside price protection. Carroll defined downside price protection as a custom which provided for a ceiling, but not a floor, on the price of sugar. Carroll testified further that the sugar seller would set a maximum price at which a particular buyer could purchase sugar during a period of time agreed upon between the seller and purchaser. If the market price of sugar declined before delivery, then the buyer could purchase the sugar at the lower market price from the seller. Carroll testified that the sugar industry eliminated

the practice of downside price protection in late 1974 or early 1975 and that the practice did not exist in the sugar industry in the Chicago area in 1980, when the agreement in controversy was entered into. Carroll testified that from 1975 through 1978 he worked for three different sugar sellers and that none of them offered their buyers downside price protection. Moreover, Carroll testified, he was employed by Great Western from 1979 through 1981 and during that time Great Western did not offer its sugar buyers downside price protection.

William Nelson, a 26-year Great Western employee, also testified on behalf of plaintiff, Great Western. Nelson testified that the price of sugar increased dramatically during 1980 and peaked in November 1980 at $52 per hundredweight. By the summer of 1981, Nelson stated, the price of sugar dropped to $20 per hundredweight. Nelson also testified that after 1974 sugar companies sold sugar at current prices to be delivered to the buyer in the future without regard to the price of sugar at the time of the future delivery. He also stated that there were prompt sugar sales under contracts with firm price agreements. Sugar sellers after 1974 did not engage in downside price protection, stated Nelson.

Nelson was asked to explain the "Other Conditions" clause in Criswell's confirmation letter of October 20, 1980. Nelson explained that during negotiations the buyer, Herrick, stated that Indiana Sugars, a Great Western competitor, was offering sugar at a lower delivered price than Great Western, and therefore, the Great Western salesman obtained authorization from Great Western's Denver office to offer the buyer the same delivered price as Indiana Sugars' delivered price. Nelson testified that Great Western salesmen and brokers were not authorized to offer price protection to cover buyers in a declining market. Regarding agreed-upon pricing, Nelson testified that Great Western would not change a negotiated price under any circumstance.

Herrick testified on behalf of defendant, World's Finest. Herrick testified that during his conversation with Carroll on October 20, 1980, he explicitly stated to Carroll that he, Herrick, would send a purchase order to Great Western containing the legend, "For delivery as needed during 1st quarter, 1981. Unused quantities during 1st quarter of 1981 will be cancelled." Herrick testified that his inclusion of the "unused quantities" language in the purchase order meant that Great Western was required to meet the selling price of any of Great Western's competitors, and not just Indiana Sugars. Herrick stated further that the "unused quantities" language was indicative of a

widely practiced custom in the sugar industry known as downside price protection.

Herrick defined downside price protection as a custom which provided that in the event a buyer placed an order for sugar with a sugar seller and was subsequently able to obtain a lower market price from a different seller, then the first seller would be required to meet the subsequent lower market price, or, in the alternative, the seller was required to allow the buyer to cancel the order and obtain the sugar from another source at the lower price. Herrick further testified that the "unused quantities" language guaranteed World's Finest the right to cancel the order in the event that Great Western refused to meet its competitors' prices. Herrick also testified that when he voiced his demand for downside price protection to Carroll, Carroll replied that his superiors at Great Western's Denver office would have to approve the inclusion of the "unused quantities" language in the sales agreement, that he doubted that the Denver office would approve it, and that he would contact Herrick again after discussing the "unused quantities" provision with his Denver office.

Herrick testified that he forwarded the purchase order to Carroll on October 20, 1980, and shortly thereafter, Carroll called him and stated, "Everything's all set." Herrick testified that even though Carroll did not mention downside price protection in this conversation, he believed that Great Western had agreed to give World's Finest downside price protection.

Herrick testified that in early January 1981, Carroll asked Herrick when World's Finest wanted the sugar delivered. Relying upon the "unused quantities" language in his purchase order, Herrick told Carroll that the price of sugar had declined considerably and demanded that Great Western sell the 6,000 hundredweights of sugar to World's Finest at a price lower than the contract price. Carroll refused to lower the price of the sugar and Herrick refused to schedule a date for delivery of the sugar. In February 1981, Carroll inquired again as to when World's Finest would take delivery of the sugar which it had ordered. Herrick stated, "Not at those prices," and again refused to schedule delivery at the contract price. In March 1981, Herrick received a letter from William Sheehy of Great Western, regarding delivery of the sugar to World's Finest. Herrick testified that he replied that the "unused quantities" language in his purchase order relieved World's Finest of any contractual obligation to purchase the ordered sugar at the contract price and again refused to schedule delivery.

In finding for plaintiff, Great Western Sugars, and against defend-

ant, World's Finest, the trial judge rejected Herrick's testimony that the "unused quantities" language was incorporated in the contract. The trial court found that Great Western's October 20, 1980, confirmation letter did not incorporate the "unused quantities" language of World's Finest's purchase order. The trial court held that "Plaintiff's Exhibit 1 [the October 20, 1980, confirmation letter] was controlling" and that "[i]t shows the intent of the parties as expressed and as accepted by both parties." The trial court cited and relied on section 2—202 of the Uniform Commercial Code, which states:

> "Terms with respect to which the confirmatory memoranda of the parties agree or which are otherwise set forth in a writing intended by the parties as a final expression of their agreement with respect to such terms as are included therein may not be contradicted by evidence of any prior agreement or of a contemporaneous oral agreement but may be explained or supplemented
>
> (a) by course of dealing or usage of trade (Section 1—205) or by course of performance (Section 2—208); and
>
> (b) by evidence of consistent additional terms unless the court finds the writing to have been intended also as a complete and exclusive statement of the terms of the agreement." Ill. Rev. Stat. 1979, ch. 26, par. 2—202.

During the precontract negotiations, Herrick told Carroll that World's Finest would not buy the sugar unless Great Western included the "unused quantities" language in the contract. Carroll stated that he would first have to get the approval of the Denver office and also that he doubted that that was possible. Carroll agreed to relay World's Finest's demand to the Denver office and then get back to Herrick on the subject. It was undisputed at trial that Carroll did not speak to Herrick again regarding the unused quantities language.

The trial court found that Herrick could not have interpreted Carroll's later silence on the "unused quantities" language as Great Western's acceptance of the term as a part of the contract because Carroll had explicitly told Herrick that his Denver office would have to approve the term and that he doubted that the Denver office would do so. The trial court held that under these circumstances World's Finest's "unused quantities" demand constituted a counterproposal, acceptance of which was not evidenced by Carroll's silence on the matter.

Herrick did not insist on Great Western's acceptance of the "unused quantities" language as a condition precedent to confirm the

agreement. Instead, Herrick sent a purchase order which confirmed delivery at $49.76 per hundredweight, the agreed-upon price, "for delivery as needed during the 1st quarter of 1981." Herrick also included in the purchase order the statement, "Unused quantities during the 1st quarter will be cancelled."

■ World's Finest here contends that the contract incorporates its purchase order and that the contract was also subject to a prior course of dealing and custom of the sugar industry and downside price protection, both of which precluded liability for World's Finest failure to take any sugar in the first quarter of 1981. World's Finest further contends that because Great Western failed to meet the lower market prices of Great Western's competitors, World's Finest was not obligated to pay the higher contract price. Again, we disagree.

In *Peoria Harbor Marina v. McGlasson* (1982), 105 Ill. App. 3d 723, 729-30, 434 N.E.2d 786, we stated:

"The question of a condition precedent not written into the final agreement brings us to the parol evidence rule as found in section 2—202 of the UCC (Ill. Rev. Stat. 1979, ch. 26, par. 2—202). This section provides that a writing intended by the parties as a final expression of their agreement may not be contradicted by evidence of any prior agreement or contemporaneous oral agreement. However, the writing may be explained or supplemented by evidence of consistent additional terms, unless the court makes the determination that the writing was intended also as a complete and exclusive statement of their terms. It is the trial court that decides whether the writing was to be the final expression of the parties' agreement. If the trial court decides that it was, contradictory parol evidence should be precluded. *Luria Brothers & Co. v. Pielet Brothers Scrap Iron & Metal, Inc.* (7th Cir. 1979), 600 F.2d 103."

Herrick testified that the terms "unused quantities" and "downside price protection" were used interchangeably in the sugar industry, but he offered no other evidence to support this contention. The evidence established that downside price protection meant that the buyer need not purchase any sugar once the seller failed to lower its price to meet the lower market price. The buyer thus had an option not to purchase at all. The evidence also established that "unused quantities" meant that once the major portion of the order had been delivered, then any insignificant "unused quantities" remaining need not be delivered. The trial court ruled, "There is no evidence here that unused quantities was used for the entire agreement ***. It's unavailing to the purchaser for [*sic*] World's Finest Chocolate to say that

that gave them the right to cancel the whole contract." Moreover, when Herrick was specifically asked on direct examination whether Carroll ever told him that the "unused quantities" language was part of the agreement or whether the Denver office accepted the term, Herrick answered, "No." Likewise, when Herrick was asked on direct examination whether there was ever any response from Great Western, either through Carroll or the Denver office, signalling acceptance of the "unused quantities" term, Herrick replied, "No, they never said that."

The trial court correctly concluded that Great Western's intent not to incorporate the "unused quantities" language in the contract was evident from Carroll's silence and that Herrick's inclusion of the "unused quantities" language in the purchase order did not obligate Great Western to accept the term as a part of the contract. We agree with the trial court's finding that there was a binding agreement evidenced by the confirmation letter, plaintiff's exhibit No. 1, and World's Finest could not abrogate that binding agreement by invoking the unincorporated language of the purchase order. Great Western is therefore not estopped from asserting that the "unused quantities" language of the purchase order was not incorporated in the agreement as World's Finest here contends. Under the circumstances we need not address World's Finest's contention that the trial court erred in construing the terms of the purchase order.

■ We next address World's Finest's contention that Great Western's failure to tender the 6,000 hundredweights of sugar constituted a failure to perform a condition precedent to World's Finest's duty to accept any sugar. This argument is without merit. Section 2–503 (Ill. Rev. Stat. 1979, ch. 26, par. 2–503), states:

"(1) Tender of delivery requires that the seller put and hold conforming goods *at the buyer's disposition* and give the buyer any notification reasonably necessary to enable him to take delivery. The manner, time and place for tender are determined by the agreement and this Article, and in particular:

(a) Tender must be at a reasonable hour, and if it is of goods they must be kept available for the period reasonably necessary to enable the buyer to take possession; but

(b) unless otherwise agreed *the buyer* must furnish facilities reasonably suited to the receipt of the goods." (Emphasis added.)

The Uniform Commercial Code comment to section 2–503 (Ill. Rev. Stat. 1979, ch. 26, par. 2–503) provides that tender of delivery contemplates an offer coupled with a present ability to fulfill all the

conditions resting on the tendering party and must be followed by actual performance if the other party shows a readiness to proceed. Additionally, the comment states that "tender connotes such performance by the tendering party as puts the other party in default if he fails to proceed in some manner."

■ The evidence was undisputed that at all times relevant to these proceedings Great Western had sugar in its possession to be delivered *"at the buyer's disposition."* The evidence also established that pursuant to the agreement between Great Western and World's Finest and the custom and usage in the sugar industry, the manner and time and place of deliveries were designated by the buyer's call to the seller for sugar as it was needed by the buyer. Here, World's Finest refused on several occasions to furnish Great Western with any dates that it would accept delivery of the ordered sugar and refused to furnish facilities suited to the receipt of the ordered sugar. Great Western's tender constituted a performance sufficient to put World's Finest in default when Herrick rejected the sugar stating, "Not at those prices."

World's Finest repudiated the contract by refusing to accept the sugar which it contracted to purchase. Therefore, even if Great Western had not made a formal tender of the sugar, a formal tender was excused by World's Finest's repudiation and did not constitute a condition precedent to World's Finest's duty to accept the sugar. (See Ill. Rev. Stat. 1979, ch. 26, par. 2—610(c); *Interocean Mercantile Corp. v. Sawyer Biscuit Co.* (1929), 253 Ill. App. 551 (holding that a buyer's repudiation of a contract excused the seller's formal tender of delivery).) The trial court's finding that "no further tender was necessary" was abundantly supported by the evidence.

■ World's Finest next contends that the trial court erred in selecting a date subsequent to the date of World's Finest purported repudiation as the date from which to measure damages. This argument is without merit.

The comment to section 2—610 also states that the measure of damages applicable in a case of repudiation by the buyer is prescribed by section 2—708 (Ill. Rev. Stat. 1979, ch. 26, par. 2—708), which states:

> "(1) Subject to subsection (2) and to the provisions of this Article with respect to proof of market price (Section 2—723), the measure of damages for non-acceptance or repudiation by the buyer is the difference between the market price at the time and place for tender and the unpaid contract price together with any incidental damages provided in this Article

(Section 2—710), but less expenses saved in consequence of the buyer's breach."

Herrick and Carroll both testified that in early January 1981, they discussed delivery of the sugar but that Herrick refused to schedule a date for delivery. Great Western left the determination of the amount of damages to the discretion of the court. The court, using the UCC as a guideline, selected January 15, 1981, as the date for the assessment of damages. World's Finest could have called for delivery at any time in the first quarter of 1981, January 1, 1981, through March 31, 1981. We cannot conclude that the trial court erred in selecting January 15, 1981, as the date on which to measure damages.

On January 15, 1981, the market price of a hundredweight of sugar was $39.50. The contract price of the sugar was $47.90 per hundredweight, leaving a price differential of $8.40 per hundredweight. At a price differential of $8.40 per hundredweight, the trial court correctly awarded Great Western damages on the 6,000 hundredweights of sugar in the amount of $50,400. We find no reason to alter the trial court's assessment of damages.

■ Finally, World's Finest contends that the damages were not liquidated, certain, or readily calculable and therefore the trial court should not have awarded Great Western prejudgment interest. The trial court correctly assessed damages at $50,400 and awarded the plaintiff the statutory interest of 5% of that amount from January 15, 1981, to the date it rendered judgment. See section 2 of the Interest Act (Ill. Rev. Stat. 1973, ch. 74, par. 2).

The judgment of the circuit court is affirmed.

Affirmed.

LORENZ, P.J., and MURRAY, J., concur.